UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


JOHN BENJAMIN,

               Plaintiff,

       v.

DOUGLAS RIDGE RIFLE CLUB, an
Oregon non-profit social organization,

               Defendant.

_____

Civil No. 07-1144-HA


OPINION AND ORDER


HAGGERTY, District Judge:

      Plaintiff filed this case in 2007, alleging violations of the Clean Water Act (CWA), the

Resource Conservation and Recovery Act (RCRA), and state nuisance laws.  Plaintiff alleges

that, since 1972, defendant Douglas Ridge Rifle Club (DRRC) has discharged and allowed the

discharge of pollutants into waters of the United States without first obtaining a National

Pollution Discharge Elimination System (NPDES) permit.  33 U.S.C. § 1311(a); Or. Rev. Stat.

(ORS) 468B.025.  Plaintiff claims that lead bullets shot on DRRC's shooting range contaminate

-1-  OPINION AND ORDER

Corps Creek and nearby wetlands.  Additionally, plaintiff asserts that defendant, by allowing lead bullets to remain in earthen shooting berms, has disposed of and stored hazardous waste upon the facility without a permit to do so, in violation of RCRA.  42 U.S.C. § 6925(a); ORS 466.095.  Finally, plaintiff claims that defendant placed fill material in wetlands and creeks on DRRC property without first obtaining a permit pursuant to ORS 196.825.

Defendant filed a Motion for Summary Judgment [51] and oral argument was heard on November 10, 2009.  For the following reasons, defendant's Motion is denied.

**BACKGROUND**

The following facts are undisputed unless otherwise noted and are stated in the light most favorable to plaintiff.

Since approximately 1955, DRRC has operated a small arms firing range.  The facility consists of multiple-use outdoor rifle and pistol ranges, a sporting clays course, a trap range, an archery range, a silhouette range, and an indoor range.  Def.'s Concise Statement of Material Facts [53] ("Def. Facts") ¶ 1.  The sporting clays course and trap range are not currently in use. *Id.*  Members of DRRC shoot lead bullets from rifles and pistols at the outdoor range.  Def. Facts ¶ 2.

A waterway, referred to by plaintiff as Corps Creek, and by defendant as Corps Ditch, crosses a portion of DRRC property.  Pl.'s Response to Concise Statement of Material Facts [66] ("Pl. Facts") ¶ 11.  The parties agree, that at times, the waterway has overflowed onto the shooting range during unusually heavy and prolonged rain events.  Def.'s Reply to Pl.'s Statement of Additional Facts [74] ("Def. Reply") ¶ 3.  It is disputed whether the waterway flows only intermittently or throughout the entire year.  Pl. Facts ¶ 11.  As the waterway leaves

defendant's property it flows over fields and farmland until meeting Deep Creek 2.27 miles

downstream.  Def. Facts ¶ 13.  From that point, Deep Creek flows 2.14 miles until meeting the

Clackamas River.  *Id.*

Several wetlands are also present on defendant's property.  Each party employed

environmental consultants to perform wetland deliniations on the property.  The parties disagree

as to the location and size of the wetlands and each contends that the deliniation submitted by the

opposing party is inaccurate.  Def. Reply ¶ 1; Pl. Facts ¶ 15.  The United States Fish and Wildlife

Service tentatively identified the silhouette range as a temporarily flooded wetland.  Def. Reply ¶

7.  Defendant denies that this area is, in fact, a wetland.  *Id.*

Defendant has installed earthen berms to protect surrounding buildings from shooting

operations.  Pl. Facts ¶ 19.  Significantly, Corps Creek is surrounded by a berm on each side.  In

2001 and 2002, the old "100 yard berm," which borders the creek to the north, was replaced by

the new "200 yard berm," which borders the creek to the south.  *Id.*  The 100 yard berm is no

longer used as a safety berm, but it has not been removed.  *Id.*

Defendant claims that the berms also serve to protect Corps Creek and the wetlands from

direct lead fallout, but plaintiff contends that the berms do not adequately protect against lead

contamination.  Def.  Facts ¶ 14; Pl. Facts ¶ 12. Specifically, plaintiff asserts that bullets hitting

targets on the silhouette range fragment and fly into Corps Creek and "Wetland E."  Pl. Facts ¶

20.

In 2005 and 2006, defendant had dirt delivered to the property to build and maintain the

shooting berms.  Pl. Facts ¶ 22.  Defendant admits that part of a wetland on the west side of the

known distance range was filled.  Def. Reply ¶ 8.  Defendant claims that this area is not a water

of the United States.  *Id.*  Defendant's consultant noted that the area between "Wetland F" and

"Wetland G" was filled.  Def. Reply ¶ 15.  Plaintiff asserts, and defendant denies, that fill was

also placed between "Wetland F" and Corps Creek.  *Id.*

In November 2006, defendant contracted with AMEC Earth and Environmental (AMEC)

to prepare an Environmental Stewardship Plan (Plan) for its range operations.  Def. Facts ¶ 5.

Upon completion of the Plan in May 2007, the United States Environmental Protection Agency

(EPA) issued a Certificate of Recognition, accepting the Plan.  *Id.*  After defendant updated the

Plan, the Oregon Department of Environmental Quality (ODEQ) approved it.  *Id.*  Plaintiff

alleges that the Plan was a direct result of the present lawsuit and does not comply with EPA

guidelines.  Pl. Facts ¶ 5-6.

Within the years of 2007, 2008, and 2009, ODEQ requested information from defendant

and issued a strategy recommendation for the facility's future operations.  Def. Facts ¶ 7.  ODEQ

later found that an expanded preliminary assessment was necessary to determine the nature and

extent of hazardous waste contamination on the property.  *Id.*  ODEQ concluded that no

hazardous waste violations existed on the property, but ODEQ did not render an opinion

regarding the allegations raised in the present action.  Pl. Facts ¶ 7.

ODEQ further determined: (1) no groundwater contamination exists at the property; (2)

lead was detected in one surface water location on the property and in the sediment of Corps

Creek; and (3) elevated concentrations of lead were detected in several shooting berms.  Def.

Facts ¶ 8.

Defendant entered into a Consent Order with ODEQ, agreeing to continue operating

pursuant to the Plan to ensure the protection of human health and the environment.  Pl. Facts ¶

-4-  OPINION AND ORDER

27. Under the Consent Order, AMEC will inspect the property annually and determine whether the plan is adequately protecting the environment. Def. Facts ¶ 10. Additionally, every five years AMEC will sample sediment in Corps Creek to ensure the prevention of on and off-site environmental degradation. *Id.*

Over defendant's objections, the court allowed plaintiff's experts, PBS Engineering + Environmental (PBS), to conduct site inspections on the property. Pl. Facts ¶ 24. PBS reports state that portions of the site, including the wooded wetlands, known distance range, shooting berms, and the banks of Corps Creek were contaminated with high levels of lead. *Id.* Specifically, the report states that wooded wetlands west of the known distance range showed levels of lead at 11,500 mg/kg[1]. Pl. Facts ¶ 25. The known distance range showed levels of lead at 16,000 mg/kg. *Id.* Levels of lead on the bank of Corps Creek were measured at 1,130 mg/kg and sediment from the creek was measured at 284 mg/kg. *Id.* ODEQ recommends cleanup at lead concentrations of 800 mg/kg or greater and ODEQ has established a Level II Ecological Risk Screening Level Value for Freshwater and Marine Sediments at 35 mg/kg.

PBS conducted additional tests to determine the amount of leachable lead in soil samples. Pl. Facts ¶ 26. The report showed elevated levels of lead in various portions of the DRRC property. *Id.*

Plaintiff alleges that there has been only one attempt to reclaim lead from the shooting range. Pl. Facts ¶ 30. This attempt was unsuccessful. *Id.* Defendant admits that it was unable to find documents recording other lead reclamation attempts but several individuals recall

---

[1]Lead concentration was measured in the units of milligrams of lead per kilogram of sediment.

removing lead from the berms.  Def. Reply ¶ 16.

 **STANDARDS**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

On summary judgment, the court must view the facts and draw inferences in the manner most favorable to the non-moving party.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  Defendant, the moving party, bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  When the non-moving party bears the burden of proving a claim or defense, the moving party can meet its burden by pointing out the absence of evidence of a genuine issue of material fact from the non-moving party.  *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Anderson,* 477 U.S. at 248-49.  There must be specific, admissible evidence identifying the basis for the dispute.  *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1980).

/ / / /

/ / / /

-6-  OPINION AND ORDER

## DISCUSSION

Plaintiff claims that defendant discharged pollutants into the wetlands and waterways on DRRC property without a NPDES permit, disposed of and stored hazardous lead waste without a RCRA permit, and filled wetlands in violation of Oregon state law. Defendant moves for summary judgment arguing that: (1) the wetlands and other waters on DRRC property are not jurisdictional waters under the CWA; (2) lead from shooting operations does not constitute hazardous waste under RCRA; and (3) the remaining state claims should be dismissed for a lack of federal jurisdiction.

## I.    Plaintiff's CWA Claim.

Plaintiff asserts that defendant is currently in violation of Section 301(a) of the Clean Water Act; 33 U.S.C. § 1311(a), because defendant or DRRC members discharged lead shot into Corps Creek and surrounding wetlands without a NPDES permit. Defendant contends that this claim must be dismissed because Corps Creek and the surrounding wetlands are not "waters of the United States" and therefore, are not subject to federal jurisdiction.

The CWA was enacted by Congress "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this objective, the CWA prohibits the discharge of pollutants into navigable waters, unless the discharger has a permit to do so. 33 U.S.C. § 1311(a). The "discharge of a pollutant" is defined broadly to include "any addition of any pollutant to navigable waters from any point source," 33 U.S.C. § 1362(12), and "pollutant" is defined broadly to include: "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and

-7-  OPINION AND ORDER

industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6).  Most

relevant here, "navigable waters" is defined as the "waters of the United States." 33. U.S.C. §

1362(7).        Under both United States Army Corps of Engineers (Corps) and EPA regulations,

a water body need not be navigable in the traditional meaning in order to be considered a water

of the United States.  EPA regulations define "waters of the United States" to mean:

(1)    All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

(2)    All interstate waters including interstate wetlands;

(3)    All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:

      (i)    Which are or could be used by interstate or foreign travelers for recreational or other purposes; or

      (ii)   From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

      (iii)  Which are used or could be used for industrial purposes by industries in interstate commerce;

(4)    All impoundments of waters otherwise defined as waters of the United States under this definition;

(5)    Tributaries of waters identified in paragraphs (1) through (4) of this section;

(6)    The territorial sea;

(7)    Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (1) through (6) of this section; waste treatment systems, including treatment ponds or lagoons designed to meet the requirements of CWA (other than cooling ponds as defined in 40 CFR 423.11(m) which also meet the criteria of this definition) are not waters of the United States.

40 C.F.R. § 230.3(s).

/ / / /

/ / / /

**A.    Corps Creek.**

Defendant argues that Corps Creek is not a water of the United States, because it does not maintain a "significant nexus" to water quality in the Clackamas River.  In so doing, defendant relies heavily upon the Supreme Court case,  *Rapanos v. United States*, 547 U.S. 715 (2006). Justice Kennedy's concurring opinion in *Rapanos*, which has been followed by the Ninth Circuit, *N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 999-1000 (9th Cir. 2007), explained that *wetlands* are not jurisdictional unless they maintain a significant nexus with a navigable-in-fact water.  *Rapanos*, 547 U.S. at 779.  Defendant's reliance is misplaced in regard to Corps Creek, because the significant nexus test applies only to federal jurisdiction over adjacent wetlands.  *City of Healdsburg*, 496 F.3d at 997.[2]   The Court had previously confirmed that waters of the United States include tributaries of traditionally navigable waters.  *Id.* (citing *United States v. Riverside Bayview Homes*, 474 U.S. 121 (1985)); 40 C.F.R. § 230.3(s)(5).[3]

In *Rapanos*, the Court provided insight as to what constitutes a tributary.  The plurality explained that the term "waters of the United States" includes "relatively permanent continuously flowing bodies of water 'forming geographic features.'"  547 U.S. at 739.  In a concurring opinion, Justice Kennedy held that, in order to be considered jurisdictional, waters must possess

---

[2]Justice Kennedy's significant nexus test is inapplicable to determining the jurisdictionality of tributaries to waters of the United States.  By demanding that "*wetlands* possess the requisite nexus," Justice Kennedy limits the applicability of his legal standard to wetlands adjacent to jurisdictional waters.  *Rapanos*, 547 U.S. at 781.  *But see Environmental Information Center v. Pacific Lumber Co.*, 469 F. Supp. 2d 803, 823 (N.D. Cal., 2007) (using the significant nexus test to analyze the jurisdictionality of a tributary of a navigable water).

[3]A non-navigable tributary is defined as "a non-navigable water body whose waters flow into a traditional navigable water either directly or indirectly by means of other tributaries." *Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in Rapanos v. United States & Carabell v. United States (EPA Guidance Document)*, December 2, 2008, *available at* http://www.epa.gov/owow/wetlands/pdf/CWA_Jurisdiction_Following_Rapanos120208.pdf.

-9-  OPINION AND ORDER

a significant nexus with the "chemical, physical, and biological integrity" of navigable-in-fact

waters. *Id.* at 780. The dissent deferred to the Corps' regulations and affirmed federal regulation

of tributaries of jurisdictional waters. *Id.* at 788.

In a case such as *Rapanos*, where no opinion commands a majority of the Court, the

Supreme Court has combined aspects of disparate opinions to establish a majority that can

provide a controlling rule of law. *See League of United Latin Am. Citizens v. Perry*, 548 U.S.

399 (2006) (relying upon concurring and dissenting opinions to establish majority support for a

legal standard); *see also Waters v. Churchill*, 511 U.S. 661, 685-86 (1994) (Souter, J.,

concurring) (reviewing plurality, concurring, and dissenting opinions to establish a legal test to

be followed by lower courts). The Supreme Court has expressly allowed lower courts to use a

similar analysis. *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1,

17 (1983) (concluding that "[o]n remand, the Court of Appeals correctly recognized that the four

dissenting Justices and Justice Blackmun formed a majority to require application" of the correct

legal standard).

In *Rapanos*, the dissent made it clear that it would find jurisdiction when either the

plurality's or Justice Kennedy's test is satisfied. 547 U.S. at 810. With the support of the

dissenting Justices, both opinions command a majority of the Court and constitute a controlling

rule of law.

Defendant argues that, in *City of Healdsburg*, the Ninth Circuit declared Justice

Kennedy's test to be the exclusive test used to determine the jurisdictionality of waters. In *City

of Healdsburg*, the Ninth Circuit initially declared that Justice Kennedy's concurring opinion

provided the "controlling rule of law." 457 F.3d 1023, 1029 (9th Cir. 2006) (*amended by* 496

F.3d 993 (9th Cir. 2007).  Almost one year later, the Ninth Circuit reaffirmed this ruling in

*United States v. Moses*, by expressly stating that Justice Kennedy's test provided the controlling

rule of law.  496 F.3d 984, 990 (9th Cir. 2007).  However, three days after the ruling in *Moses*,

the Ninth Circuit issued an amended opinion in *City of Healdsburg,* holding that "Justice

Kennedy's concurrence provides the controlling rule of law *for our case*."  496 F.3d 993, 999-

1000 (9th Cir. 2007) (emphasis added).  By adding the phrase "for our case," the court limited its

ruling to the facts before them at that time.  In accordance with *Mercury Construction*, this court

finds that a water body constitutes a water of the United States if the legal standards enunciated

by either the plurality or Justice Kennedy is satisfied.  *See United States v. Johnson*, 467 F.3d 56,

66 (1st Cir. 2006) (holding that the federal government can establish jurisdiction over

waterbodies which meet either the plurality's or Justice Kennedy's standard).  *See also United

States v. Robison*, 521 F.3d 1319, 1327 (11th Cir. 2008) (Wilson, J., Dissenting) (explaining why

courts cannot conclude that Justice Kennedy's test is the only legal standard applicable to CWA

jurisdictional determinations).

  In *Rapanos*, the plurality opined that a tributary must be "relatively permanent" in order

to be subject to federal regulation.  547 U.S. at 739.  This term was further defined by the

plurality, explaining that a tributary is not jurisdictional if "water flows intermittently or

ephemerally" or if it merely "provides drainage for rainfall."  *Id.*  However, Justice Scalia opined

that the phrase does not "necessarily exclude streams, rivers, or lakes that might dry up in

extraordinary circumstances, such as drought."  *Id.*  The plurality would also not exclude

"seasonal rivers, which contain continuous flow during some months of the year but no flow

during dry months."  *Id.*

-11- OPINION AND ORDER

Defendant argues that Corps Creek is not a water of the United States because it is oftentimes dry and therefore is not "relatively permanent."  However, through declarations of longtime DRRC members, plaintiff sets forth facts alleging that the creek has never run dry.  *See, e.g.,* Britt Decl. [61] ¶ 4.  Moreover, plaintiff asserts that Corps Creek was listed as critical salmon habitat by the Oregon Department of State Lands.  Pl. Facts ¶ 16.  These facts substantiate plaintiff's assertion that the creek flows continuously and is a tributary of the Clackamas River.  Therefore, a genuine issue of fact remains as to Corps Creek's status as a jurisdictional water and summary judgment is inappropriate.

**B.    Surrounding Wetlands**

As explained above, and pursuant to the Supreme Court's rulings in cases such as *Mercury Construction*, wetlands which satisfy either the plurality's test or Justice Kennedy's test are jurisdictional.

**1.    Adjacent Wetlands Maintaining a Significant Nexus with the Clackamas River.**

In *Rapanos*, Justice Kennedy found that adjacent wetlands are regulable when they maintain a "significant nexus" with waters that are navigable-in-fact.  *Rapanos*, 547 U.S. at 779.  A significant nexus must be established on a "case-by-case basis when [one] seeks to regulate wetlands based on adjacency to non-navigable tributaries."  *Id.* at 782.  A significant nexus exists "if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'"  *Id.* at 780.   However, if "wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory

term 'navigable waters.'"  *Id.*

In *City of Healdsburg*, the Ninth Circuit, defined the features necessary to demonstrate a "significant nexus" between a navigable-in-fact water and the wetlands in question.  496 F.3d at 999-1000.  First, the court analyzed the physical connection between the navigable-in-fact water and the wetland in question.  *Id.* at 1000.  Second, the court analyzed the ecological similarities shared by the navigable-in-fact water and the wetland in question.  *Id.* at 1000-01.  Finally, the court analyzed to what extent the wetland at issue affected the chemical integrity of the navigable-in-fact water.[4]  *Id.* at 1001.

The Ninth Circuit found that a hydrological connection would affect the physical integrity of the navigable-in-fact water.  *Id.* at 1000.  Thus, a wetland with a hydrological

---

[4]  The Ninth Circuit has not expressly addressed whether the significant nexus test requires a showing that a wetland share a chemical, physical, *and* biological connection with a navigable-in-fact waterway.  However, in *City of Healdsburg*, the Ninth Circuit implicitly held that the significant nexus test requires evidence of all three by analyzing the chemical, physical, and biological connections between the wetland at issue and a navigable-in-fact water.  496 F.3d at 999-1000.  This court believes that satisfaction of the significant nexus test requires only a demonstration of significant chemical, physical, *or* biological nexus with a navigable-in-fact water.  In developing the significant nexus test, Justice Kennedy set out to uphold the purposes of the CWA by drawing his test directly from the text of the Act.  "The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a).  Interpreting Justice Kennedy's test as requiring a demonstration of a chemical, physical, *and* biological nexus is incongruous with the Act's objectives and inconsistent with the language in the Act.  The Act seeks to protect each aspect of the Nation's water quality independently of the others.  One might argue that Justice Kennedy intended to require a showing of all three given that he declared a "mere hydrologic connection" to be inadequate to assert jurisdiction in all cases.  *Rapanos*, 547 U.S. at 784.  However, his opinion reflects that he was concerned that under the plurality's test, "[t]he merest trickle, if continuous, would count as a 'water' subject to federal jurisdiction."  *Id.* at 769.  What is important is not that the nexus between the wetland and the navigable water is chemical, physical, and biological, but that the nexus is *significant*.  Therefore, a showing of a *significant* chemical, physical, or biological connection satisfies Justice Kennedy's test.

-13-OPINION AND ORDER

connection to the navigable-in-fact water would satisfy the physical connection aspect of Justice Kennedy's "significant nexus" test. *Id.* In *City of Healdsburg*, the court found a hydrological connection to exist when the jurisdictional water flooded so that it and the wetland "comingle[d]." *Id.* Plaintiff presents several reports of Corps Creek overflowing during storm events, flooding "large parts of the outdoor range." Britt Decl. ¶ 4. Plaintiff asserts that "[t]he silhouette range is particularly susceptible to flooding and is covered in several inches of standing water through much of the rainy season." Benjamin Decl [65] ¶ 11. PBS confirmed that the land comprising the silhouette range was, in fact, a wetland. Pl. Facts ¶ 21. Finally, it is undisputed that Corps Creek is hydrologically connected to the Clackamas River. Def.'s Facts ¶ 13. Because the water in the wetlands at issue frequently "comingles" with the water in Corps Creek, and Corps Creek is hydrologically connected to the Clackamas River, it follows that the wetlands are hydrologically connected to the Clackamas River. According to Ninth Circuit precedent, this "comingling" of the two bodies of water is sufficient to prove a physical connection.

Similarly, plaintiff asserts that Wetlands G and F were historically connected to Corps Creek. The Supreme Court has ruled that "[w]hen once found to be navigable, a waterway remains so." *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 407 (1940). In other words, a man-made structure cannot eliminate the CWA's jurisdiction over a water of the United States. *Moses*, 496 F.3d at 989. In *Moses*, a diversion constructed long before the enactment of the CWA resulted in a dry river bed for much of the year. *Id.* The court concluded that, "however long ago undertaken," a man-made diversion cannot change a water of the United States into something else. *Id.*

-14- OPINION AND ORDER

Defendant argues that *United States v. Milner*, Nos. 05-35802, 05-36126, 2009 WL 3260528 (9th Cir., Oct. 9, 2009) stands for the opposite proposition.  In so doing, defendant cites a portion of the opinion in which the court concluded that land that has long been made dry by artificial means is not subject to federal jurisdiction.  Def.'s Supplemental Mem. in Supp. of Sum. J. [79] at 4.  In this portion of the opinion, the Ninth Circuit was discussing CWA jurisdiction over dry land which was once covered by water.  The facts in Milner differ from those in this case.  Here, the wetlands at issue are not dry land.  Rather, it is alleged that Wetlands G and F once directly abutted Corps Creek and that the connection between the wetlands and the creek was destroyed by artificial means.

Specifically, plaintiff alleges that Wetland F was connected to Corps Creek through the "west ditch" and "centerline ditch," which plaintiff's consultants confirmed were filled by defendant.  Pl. Facts ¶ 23, 29; Supplemental Britt Decl. [90] ¶¶ 2-5.  Plaintiff further alleges that the fill destroyed a continuous surface water connection between the wetlands and the creek.  Pl. Facts ¶ 23.  Plaintiff similarly asserts that fill material was placed between Wetland F and Wetland G.  Pl. Facts ¶ 29.  In its natural state,  Wetland G had a hydrological connection to Wetland F, and ultimately Corps Creek.  Because, the jurisdictionality of a water cannot be destroyed by man-made diversions, these waters are found to share a hydrological connection with Corp Creek for the purposes of this analysis.

Additionally, plaintiff alleges that Wetlands A, B, I, and H are connected to Corps Creek via "ditch B."  Pl.'s Supplemental Mem. in Opp'n to Def.'s Mot. for Summ. J. at 5.  The water in these wetlands originates in freshwater springs and flows into Corps Creek year-round.  *Id.* Finally, plaintiff asserts that Wetland E has a hydrological connection with Corps Creek via

"ditch D."  *Id.* at 6.  When the silhouette range floods, the water in Wetland E commingles with that of the silhouette range, which is connected to "ditch D."  *Id.*

In short, these facts demonstrate that each wetland on DRRC's property maintains a hydrological connection with Corps Creek.  As previously stated, Corps Creek flows into Deep Creek, which ultimately empties into the Clackamas River.  Therefore, those wetlands that share a connection with Corps Creek also share a hydrological connection with a navigable-in-fact water.

Next, plaintiff has demonstrated an ecological connection between the adjacent wetlands and the Clackamas River.  In *City of Healdsburg*, the court found a significant ecological connection to exist when the wetland supported bird, mammal, and fish populations that were also integral to the river ecosystem.  496 F.3d at 1001.

In the present case, plaintiff asserts that Corps Creek and the adjacent wetlands share an ecological connection with the Clackamas River as evidenced by the Oregon Department of Forestry listing of the creek as a "salmon-bearing stream."  Dobson Decl. [64] Ex B.  The stream was also designated as essential salmon habitat.  *Id.* Ex. C.  According to Oregon Administrative Rule 141-102-0030, areas designated as essential habitat include any hydrologically connected wetlands.  Therefore, those wetlands that currently, or at one time shared a hydrological connection with Corps Creek significantly affect the health of salmon populations in Corps Creek.  The Clackamas River Basin Council has concluded that the Deep Creek Watershed, of which Corps Creek is a part, "plays an important role in maintaining the genetic and population diversity of the lower Clackamas River native coho and steelhead populations."  Steve Bauer, Ed Salminen, and John Runyon, *Clackamas River Basin Action Plan*, 73 (2005), *available at*

http://www.clackamasriver.org/wpn/basin/Clackamas_Action_Plan_Final_7-2005.pdf.  Because

the wetlands at issue have significant affect on the health of salmon in a water body of the Deep

Creek Watershed, those wetlands also affect the health of salmon populations in the Clackamas

River.  Based on the aforementioned evidence, this court concludes that those wetlands that are

hydrologically connected to Corps Creek maintain a significant ecological nexus with the

Clackamas River.

       Finally, plaintiff has demonstrated a chemical connection between the adjacent wetlands

and the Clackamas River.  In *City of Healdsburg*, the court found that the wetland at issue

affected the chemical integrity of the navigable-in-fact waterway when reports indicated

increased chloride levels in the navigable-in-fact water.  496 F.3d at 1001.  The increased levels

were a direct result of the sewage discharged into the wetland.  *Id.*  Therefore, if lead

contamination is detected downstream from DRRC property, the wetlands at issue share a

chemical nexus with the Clackamas River.

       Plaintiff has demonstrated through soil sampling that much of defendant's property is

contaminated with high levels of lead.  Pl. Facts ¶¶ 24-26.  Plaintiff has also demonstrated that

the water from Corps Creek frequently floods large portions of the property.  Britt Decl. ¶ 4;

Benjamin Decl. ¶ 11.  Given this hydrological connection, it is inevitable that the lead

contamination will impact water quality in Corps Creek.  In fact, sediment testing of the creek

bed showed lead levels in excess of the Level II Ecological Risk Screening Level Value for

Freshwater and Marine Sediments.  Pl. Facts ¶ 25.  Plaintiff's consultants found that such levels

could pose environmental risk on site and downstream, because lead can accumulate in fish

tissues which migrate into the Clackamas River.  Additionally, plaintiff's expert states that heavy

-17- OPINION AND ORDER

metals impact aquatic invertebrate populations by altering algal and plant populations.  Leyda

Decl. [93] ¶ 2.   A reduction in invertebrate populations would significantly impact salmon in the

Clackamas River, as invertebrates serve as a major source of nutrition for salmon.  *Id.*

Therefore, the wetlands at issue maintain a chemical nexus with a navigable-in-fact water.

In sum, plaintiff has set forth facts sufficient to demonstrate that all wetlands on

defendant's property maintain a significant nexus with the Clackamas River.[5]  While the

evidence above demonstrates that the wetlands at issue maintain a significant physical,

biological, and chemical nexus with the Clackamas River, as discussed previously, *see supra*

note 4, plaintiff need only have shown significant physical, chemical, or biological nexus.

Because these wetlands significantly affect the integrity of a navigable-in-fact water, they are

subject to federal regulation.

## 2.    Adjacent Wetlands with a Continuous Surface Water Connection to Jurisdictional Waters.

In *Rapanos*, the plurality found that "only those wetlands with a continuous surface

water connection to bodies that are 'waters of the United States'" are jurisdictional.  547 U.S. at

742.  Under the plurality's test, the connection must be such that it is "difficult to determine

where the 'water' ends and the 'wetland' begins."  *Id.*  In the present case, several wetlands

historically maintained hydrological connections with Corps Creek, which were destroyed by

artificial means.  Issues of fact remain as to the significance of those hydrological connections

---

[5]This court finds that plaintiff has satisfied its burden in demonstrating a significant
nexus with respect to each wetland named in the Complaint.  However, Justice Kennedy's test
allows federal jurisdiction over wetlands which, "either alone or in combination with similarly
situated lands in the region," significantly affect regulable waters.  *Rapanos*, 547 U.S. at 780.
Given the similarities shared by the wetlands at issue, plaintiff could have satisfied Justice
Kennedy's test by demonstrating their significant nexus to the creek as a group.

before their destruction.  If the connections were such that it would be difficult to demarcate the wetlands from the creek, the wetlands at issue would also satisfy the plurality's test.

**II.      Plaintiff's RCRA Claim.**

Plaintiff asserts that defendant is currently in violation of Section 3005(a) of RCRA because defendant allowed lead waste to accumulate on its property without a permit to do so. 42 U.S.C. § 6925(a).  Defendant contends that this claim should be dismissed because lead shot is not "hazardous waste" as defined by the statute.

RCRA's primary purpose is to "reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'"  *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996) (quoting 42 U.S.C. § 6902(b)).  To effectuate this purpose, RCRA requires that the operator of a hazardous waste treatment, storage, and disposal facility obtain a permit and treat hazardous waste before disposal.  *See* 40 C.F.R. Parts 264 and 268.

RCRA's extensive regulations apply only to "hazardous waste" as defined in Subpart A of 40 C.F.R. § 261.  In order for material to be considered "hazardous waste," it must first be deemed "solid waste."  40 C.F.R. § 261.3(a).  RCRA complicates the issue by creating a dichotomy in the definition of solid waste.  The regulatory definition of solid waste, 40 C.F.R. § 261.2(a), is narrower than the statutory definition, 42 U.S.C. § 6903(27).  In the regulations, solid waste is defined as "discarded material," and in order for material to be considered "discarded," it must be "abandoned" or "disposed of."  40 C.F.R. § 261.2(a).  Alternatively, under the statutory definition of solid waste, a substance need only be "discarded material."  42 U.S.C. § 6903(27).  Here, the term "discarded material" is not further defined, but legislative

history indicates that Congress intended RCRA's reach to be broad. Congress was concerned not only about the by-products of manufacturing processes when it enacted RCRA, but also "the products themselves once they have served their intended purposes and are no longer wanted by the consumer." H.R.Rep. No. 1491, 94th Cong., 2d Sess. 4 (1976); *Connecticut Coastal Fishermen's Assoc. v. Remington Arms Co., Inc.*, 989 F.2d 1305, 1314 (2nd Cir. 1993).

RCRA authorizes two types of citizens suits. The first type allows a citizen to bring suit to abate an "imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). This type of citizen suit invokes the broader statutory definition of solid waste. In the present case, plaintiff does not allege an imminent and substantial endangerment to human health or the environment. The second type, under 42 U.S.C. § 6972(a)(1)(A), allows citizens to enforce hazardous waste regulations. This provision invokes the narrower regulatory definition of solid waste. 40 C.F.R. § 26.1(b)(1). Defendant contends that, because plaintiff seeks to enforce RCRA's hazardous waste regulations, he must demonstrate that the lead deposited on DRRC's property satisfies the regulatory definition of solid waste. Accordingly, defendant asserts that this court must find that the lead shot was "abandoned" in order for it to be subject to RCRA regulations.

However, in *Safe Air for Everyone v. Meyer*, the Ninth Circuit refused to recognize the distinction between the regulatory and statutory definitions of solid waste. 373 F.3d 1035, 1046 n.14 (9th Cir. 2004). The court explained that cases that "involve challenges to EPA's regulation of particular items . . . necessarily address whether those items were within RCRA's statutory definition of 'solid waste' as 'discarded material' . . . ." *Id.* Therefore, pursuant to Ninth Circuit precedent, if lead shot meets the broad statutory definition of solid waste, it necessarily meets the

-20- OPINION AND ORDER

narrower regulatory definition.  In other words, if the lead shot is deemed to be "discarded

material," it will be considered solid waste and subject to RCRA regulations.

Defendant alleges that lead munitions do not constitute solid waste because they are not

discarded.  Rather, defendant argues that the firing of munitions is within the expected use of the

product.  In so arguing, defendant is correct.  Disposal is the affirmative act of disposing of a

substance as a waste and not the "productive use of the material."  *35500 Stevens Creek Assoc. v.

Barclays Bank*, 915 F.2d 1355, 1362 (9th Cir. 1990), *cert. denied*, 500 U.S. 917 (1991).

Defendant also accurately supports its argument with EPA's guidance document, which states

that "[l]ead shot is not considered a hazardous waste subject to RCRA at the time it is discharged

from a firearm because it is used for its intended purpose."  US EPA, *Best Management Practices

for Lead at Outdoor Shooting Ranges (BMP)*, EPA-902-B-01-001, at p. I-8 (June 2005);

*Remington Arms*, 989 F.2d 1305 (2nd Cir. 1993).

However, defendant cannot rely on the EPA guidance document in its entirety.  EPA

concluded that shooting lead shot is not regulated by RCRA, nor is a RCRA permit required to

operate a shooting range, but "spent lead shot (or bullets), *left in the environment*, is subject to

the broader definition of solid waste written by Congress and used in sections 7002 and 7003 of

the RCRA statute."  *BMP*, at p. I-8 (emphasis added).  In *Remington Arms*, the court found that

lead bullets, which were "left to accumulate long after they have served their intended purpose,"

met the statutory definition of solid waste.  989 F.2d at 1316.  Although the court refused to

decide how long materials must accumulate before they become discarded, it held that seventy

years was sufficient time.  *Id.*

Here, plaintiff alleges that defendant has been depositing lead into the land, wetlands, and

-21- OPINION AND ORDER

waterways of the outdoor shooting range since 1955. Fifty-four years of lead accumulation is more than long enough to be considered solid waste.

This decision is in line with Ninth Circuit precedent. In *Safe Air*, the court established three factors to help determine whether a substance is discarded: "(1) whether the material is 'destined for beneficial reuse or recycling in a continuous process by the generating industry itself,' (2) whether the materials are being actively reused, or whether they merely have the *potential* of being reused, (3) whether the materials are being reused by its original owner, as opposed to use by a salvager or reclaimer." 373 F.3d at 1043. (citations omitted).

First, a question of fact remains as to whether DRRC has ever reclaimed the lead which has been disposed on its property for fifty-four years. Second, while it is true that lead shot could be collected, remelted, and reused as munitions, a dispute remains as to whether DRRC has ever actively pursued such recycling initiatives. Only the third factor weighs in favor of defendant, because any alleged reclamation projects were conducted by members of the club. Overall, the factors identified in *Safe Air* suggest that the lead shot is discarded material. Therefore, plaintiff's RCRA claim survives summary judgment.

## III.    Plaintiff's State Law Claim.

Finally, plaintiff asserts that defendant violated ORS 196.810(1)(a) by filling waters of the State of Oregon without a permit to do so. On September 28, 2009, the Oregon Department of State Lands (DSL) concluded that defendant had, in fact, filled wetlands in violation of Oregon law. Defendant and DSL entered into a Consent Agreement requiring defendant to prepare additional wetland deliniations, restore those wetlands which were filled illegally, and satisfy a civil penalty of $644. Supp. Dobson Decl. [87] Ex. E. Defendant argues that the

Consent Agreement moots plaintiff's final claim. However, plaintiff asserts that wetlands, other than those at issue in the Consent Agreement, were also filled. Because plaintiff has not been awarded the relief requested in regard to those other wetlands, plaintiff's third claim is not moot. Because plaintiff's federal claims are not dismissed, this court retains jurisdiction over this state law claim.

## CONCLUSION

For the foregoing reasons, defendant's Motion for Summary Judgment [51] is DENIED.

IT IS SO ORDERED.

Dated this __1__ day of December, 2009.


       __/s/ Ancer L. Haggerty__
       Ancer L. Haggerty
       United States District Judge